## C. N. ROBERTS v. THE STATE.

### No. 1154.   Decided June 14, 1911.

### Rehearing denied December 6, 1911.

**1.—Theft of Cattle—Evidence—Bill of Exceptions.**

Where the bill of exceptions did not show that the witness answered the question objected to, or what the answer was, the same will not be considered on appeal.

**2.—Same—Evidence—Bill of Exceptions.**

Where, upon trial of theft of cattle, the defendant claimed the animal in good faith, there was no reversible error in asking the witness as to the marks on the animal, etc.; besides, the bill of exceptions was insufficient.

**3.—Same—Side-Bar Remarks.**

Where the objectionable statement of State's counsel was immediately withdrawn and could not have injured defendant, there was no reversible error.

**4.—Same—Evidence—Hearsay.**

Where, upon trial of theft, the defendant's witness stated that he did not know the alleged animal, there was no error in sustaining an objection as to what the witness had been told about it by the defendant.

**5.—Same—Evidence—Bill of Exceptions.**

Where the bill of exceptions did not state what the answer was or would have been to the question objected to, the same could not be considered on appeal.

**6.—Same—Sufficiency of the Evidence—Fraudulent Intent.**

Where, upon trial of theft of cattle, the evidence sustained the conviction, there was no error. See opinion for facts held sufficient to show a fraudulent taking.  Davidson, Presiding Judge, dissenting.

Appeal from the Criminal District Court of Harris.   Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of theft of cattle; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*E. T. Branch,* for appellant.—Cited cases in the dissenting opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was indicted, charged with the theft of a yearling, the property of F. C. Robinson.   Upon a trial, he was convicted and sentenced to two years in the penitentiary.

There are six bills of exception in the record, the first complaining that while the witness, Volmer, was on the witness stand, he was asked the following question: "Do you know F. C. Robinson?" and upon the witness answering he did, he was asked to state whether or not the yearling belonged to him, to which question the defendant objected, and upon his objection being overruled, the defendant reserved a bill of exceptions; but in the bill it is nowhere stated that the witness

answered the question or what the answer was. This bill is so incomplete it can not be considered. Tullis v. State, 28 S. W. Rep., 199.

In his second bill, defendant complains that in answer to the statement of the district attorney, "you place it now on the very spot where it was killed," the witness, Tom Roberts, stated: "I have a right to, it was running right in there," when the district attorney remarked: "Of course, if you want to save your uncle, of course you have a right to—" When the defendant objected to the side-bar remark, and the court sustained the objection, and the district attorney withdrew the question and requested the court to instruct the jury not to consider it, and the court instructed the jury: "Gentlemen, you will not consider this remark of counsel in considering the guilt or innocence of the defendant in this case." This could not have injured defendant in view of the prompt instructions of the court, and presents no error. The bill in itself is incomplete.

The defendant had testified that the animal belonged to McCullough and Tom Roberts had marked the animal for McCullough, and while he was on the witness stand, the State asked him, "How long before this animal was taken was this mark made?" to which the defendant objected. The bill does not give the answer of the witness, and as this defendant was claiming he killed and took the animal in good faith and relied on the ear marks as identification, the question was permissible. Adams v. The State, 35 Texas Crim. Rep., 285.

In bill No. 4; defendant complains of the following proceedings, while the witness, Anderson, was on the stand: "Q. Do you know whose animal it was he (deft) marked at that time?" A. "He told me— The court: 'Don't tell what he told you.' Q. "I will ask you to state whose animal he claimed at the time it was and who he was marking it for?" The State: "I object unless he knows of his own knowledge." Witness stated he knew nothing of his own knowledge only what he heard defendant say at the time. The court sustained the objection, when defendant stated that "if permitted, witness would have testified that defendant said at said time that the animal was McCullough's, and that he was marking it for him in his (Roberts') mark." The bill is incomplete in that it is not alleged or stated that this is the animal defendant is charged with stealing, and while we are not permitted to look to the statement of facts in aid of a bill, yet, if we do so, the witness states in his testimony: "I do not know the animal that he is charged as having stolen in this case." Childers v. State, 37 Texas Crim. Rep., 392.

In bill No. 5, the defendant again fails to state what the answer of the witness would have been, and is incomplete. We are not permitted to conjecture as to what the answer would have been. Adams v. State, 35 Texas Crim. Rep., 285.

Bill of exception No. 6 is in the same condition, and it is not shown that any answer was given to the question.

There is no complaint of the charge of the court, and the only other

ground alleged is the insufficiency of the evidence to sustain the conviction. F. C. Robinson testified to the ownership of the animal alleged to have been taken, and says it was taken without his consent. Upon being informed that his yearling had been killed, he started to meet the man who killed it and upon overtaking defendant, he remarked: "You have a beef, as I see there, butchered; I understand it is mine." Defendant replied, "I guess not," when "I told him I knew it was; I told him "put it out so that I can see the head;" when defendant remarked, "Oh, it is branded." Witness replied, "I guess not, it is not branded, it is mine." "He and I then pulled it out on the grass. I saw the head and recognized the flesh marks on the head. My mark was on it; swallow fork in the right and underslope in the left ear. Defendant tried to show me a brand. There was no sign of a brand on it—nothing that looked like a brand. There were marks on the beef by which I could recognize it. It was about two and a half years old." He says, "I asked defendant about the mark and he could not tell me. He first said he had bought it, and when I asked for a bill of sale, he said he had none. I then asked him from whom he got it and he said McCullough, and upon my asking what he paid for it, he claimed he was going to get half for going out there and killing it. He said McCullough's mark was something like W. M. The head and ears were there, and he then said it was marked underbit in the left and swallow fork in the right. I have owned the animal since it was a calf and milked the mother. He stated that it was branded W. M., but it had no brand on it."

William Volmer testified he received information a beef was being killed over on the prairie, and he saddled his horse and went over there. Found defendant and Noonie Lewis. Defendant remarked in a joking manner, "I am not going to let Mr. Volmer see the meat." As he threw the head in, he said, "See here, this animal is marked swallow fork in one ear, and underslope in the other." Witness said, "You have killed Mr. Robinson's heifer," and he answered, "Well, it was Roberts killing it." It was F. C. Robinson's yearling; "I know that of my own knowledge. It was killed about three miles from Brunner. Mr. Robinson's cattle run with my cattle. Never saw any cattle out there in the W. M. brand. He did not make any statement about buying it from anybody."

Wm. Fuchs testified: "I knew that yearling from a small calf. It was F. C. Robinson's calf. There is no question about my being mistaken about it. I examined the head and hide the day it was killed. There was no brand on it anywhere. I have experience in the examination of hides and cattle. Had there been a brand on it I would have discovered it. It was marked swallow fork in the right and underslope in the left ear. Roberts, the defendant, claimed it was branded 'U. M.' or 'UMA.' I would not be positive which, but did not say anything about the ownership of the cow in my presence.

I was called in to determine whether there was a brand on it. There was none.

A. J. Tucker testified that he had been informed about defendant butchering Mr. Robinson's yearling and he telephoned Mr. Robinson. Mr. Robinson recognized it as his yearling. "I examined the hide for a brand. There was no brand on it. The hide was under the meat. Mr. Robinson took it out. The defendant did not help him."

F. Frel, Jr., testified he saw defendant shoot the yearling. He was about six miles from Houston and three miles from Brunner, and he identified the defendant as the man who killed the yearling.

For the defendant, M. D. McCullough testified he knew the animal testified to in this case, and had known it since it was dropped, and it belonged to him. That he knew it by its flesh marks. He did not know how it was marked, as Tete Roberts (a brother of defendant), had marked it in his mark, saying, "Your brand hardly shows any mark, and I put my mark on her. My brother assisted me in branding her. I branded her through the hide. I branded her light. The animal was killed on Saturday and I examined the hide the following Sunday. I found no brand. In branding, I merely brand the hair. That hide was the hide of my cow if flesh marks go for anything. I authorized defendant to kill her and bring her home; that is as far as the contract went. I expected to pay him for his services."

Tom Roberts testified that defendant was his uncle; that he marked a kind of brown, mottled face heifer yearling for Mr. McCullough; marked it swallow fork in the right and underslope in the left ear; that the heifer was about two years old when he marked it. That the mark belonged to his grandfather and he, witness, had been using it for thirty-four years. "I examined the hide of the animal that defendant is charged with stealing. I identify that hide, to the best of my knowledge and belief as being the hide of the animal I marked for Mr. McCullough. I had known the animal for about a year. It was in the winter before the November in which it was killed, I marked it."

Miles Anderson testified he was with T. B. Roberts when he marked a little black, mottle-faced yearling. Did not know whether it was the yearling defendant was charged with stealing or not. He was with him only when he marked one yearling; knew nothing further except what T. B. Roberts told him.

Ira McCullough testified that he was a brother of M. D. McCullough, and knew the animal defendant was charged with stealing. That his brother, M. D. McCullough, had raised it and it belonged to his brother. That he helped brand the animal; it was branded in August, and he says, he told his brother at the time it was branded so lightly that the brand would not hold on the hide, and he said he was afraid to brand it too deep on account of the flies and worms. Did not know anything about the ear marks, but identified it by the flesh marks.

C. N. Roberts, defendant, testified he knew the animal he was charged with killing and had known it since it was a calf, and that M. D. McCullough owned it and he killed it under instructions from McCullough. "I identified the animal by ear marks and flesh marks; she had been branded, but it did not peel; she was brown, with mottled face. I never saw the brand on her. I had seen the mark on the animal, and had known the mark since I was a boy." On cross-examination he says he did not tell Mr. Robinson that he was killing the animal on halves; the marks on the ears had all healed up, and the hair had grown out on them; it was not such a very old mark, not over four months old. The mark was just there the last part of the winter before it was killed. "McCullough told me he would pay me for killing it. Mr. Robinson did not take the hide out to examine it. I took it out. It was not concealed. I killed the animal in broad daylight, on the prairie near the public road, and skinned it with a pocket-knife.

The State, in rebuttal, again placed Mr. Volmer on the stand and he testified he examined the hide the day it was killed, and had seen the hide since. It had no brand on it, and the ear marks had been on the animal for two or two and a half years. Had known the animal since it was a sucking calf, and it belonged to Robinson, and it was not possible for him to be mistaken. That Robinson's cattle run with witness' cattle and McCullough had no cattle on that range.

F. C. Robinson, recalled, testified that he marked the heifer when it was two or three months old. The ear marks on the animal were old—had been there a long time. "I examined the hide carefully. In my conversation with defendant he claimed the animal belonged to McCullough, and that McCullough had agreed to give him half to kill it." The court charged the jury:

"You are instructed that if you believe from the evidence that the cattle described in the indictment was the property of McCullough, you will acquit the defendant, or if you have a reasonable doubt thereof, you will acquit him.

"If you believe from the evidence that the defendant, at the time of taking possession of the cattle described in the indictment, honestly believed that the said cattle was the property of McCullough, you will acquit him whether in fact the one head of cattle belonged to McCullough or not, or if you have a reasonable doubt upon this point, you will acquit the defendant."

This fairly presented the theory of the defendant to the jury. No special instructions were requested, and in the motion for new trial, there is no complaint of the charge. The jury saw and heard the witnesses and they found against the contention of the defendant. The judge trying the case also saw and heard the witnesses, and he finds against the theory of defendant in overruling the motion. The jury, under the law in this State, are the judges of the credibility of the witnesses, and the weight to be given their testimony, and where

there is ample evidence to sustain their finding, we are not disposed to disturb their verdict, especially in view of the fact that all the witnesses, both for the State and defendant, testify that the hide of the animal had no sign of a brand on it, or where any brand had attempted to be placed on it. Also, defendant's theory was that the animal had only been marked a few months, while the State's evidence was that it was an old mark.

There is evidence to support the contention of defendant that even though the animal belonged to Robinson, he took it under an honest belief that it belonged to McCullough. However, Robinson testified that when he first accosted defendant, defendant told him, that the animal was branded and McCullough was giving him half to kill it. Defendant denies this and says he only said McCullough had promised to pay him. McCullough say he was not to give him half, but only to pay him for his labor. The witness, Volmer, says defendant gave no such explanation when first accosted and told him it was Robinson's heifer he was killing, but only said, "Well, this is Roberts killing it." Under the charge of the court that even though the jury believed it was Robinson's yearling, yet, if defendant believed at the time he took it, it belonged to McCullough, or if the jury had a reasonable doubt on this point, to acquit him. It is only where there is comparatively no evidence, or the great preponderance of the evidence is in favor of the defendant, that we feel authorized to disturb the finding of a jury.

Judgment affirmed.

*Affirmed.*

DAVIDSON, Presiding Judge, (dissenting).—This conviction was for cattle theft. The State's evidence is to the effect that appellant killed an animal belonging to the alleged owner, Robinson. Robinson was used as a witness, and his testimony was supported by other witnesses to the effect that the animal did belong to him. Appellant's evidence is equally strong, to the effect that the animal belonged to a man by the name of McCullough. The witnesses for the State identified the animal as Robinson's, while those for appellant as positively identified the animal as McCullough's. All of the evidence in regard to marks on the animal shows that Robinson's animal had a swallow fork in the right ear and underslope in the left. All the witnesses who knew McCullough's animal testified that the animal was marked with a crop in the right ear and underslope in the left. Robinson testified since the trouble came up he had recorded his mark. The evidence shows for the appellant that one of the witnesses—not the appellant—named Roberts, marked McCullough's animal in his, Roberts' mark, on account of the fact that McCullough did not have a recorded mark, and that the mark that he placed upon McCullough's animal had been used by him, Roberts, all his life, and in addition, it seems to have been a sort of inherited family mark for cattle. McCullough had a few cattle that he used for milk purposes in the

city of Houston, but was not a cattle man except in that manner. In fact, his work was building houses and work of that character around the city. Witnesses showed great familiarity with the animal, both as the property of McCullough and as the property of Robinson.

Appellant did not own the animal, but McCullough owned it. He knew the animal. McCullough authorized him to drive the animal up. He found some difficulty in doing so, and so informed McCullough. McCullough then authorized him to kill the animal, which appellant did. The animal was killed something like three or four hundred feet from and in plain view of the public road known as the Washington County road, which all the witnesses say was a thoroughfare and traveled by a great many people, and it may be stated that it was the public road leading from Houston to Washington County, and it is shown to have been a macadamized or shell road leading from the city of Houston. The animal was killed in the open prairie in broad daylight, and there was a party with appellant when he shot it, who assisted in butchering it. One or more parties came to where the animal was killed while the butchering was in progress. The matter was there discussed. Appellant placed the meat and hide, etc., in his cart, or delivery wagon and started into Houston. One or more of the parties who were aware of the killing and butchering notified Robinson. Robinson met appellant going down one of the main streets in the suburbs of Houston and a colloquy ensued. The hide was taken out, stretched on the ground and investigated and marks examined. When Robinson mentioned the matter, appellant stated that the animal did not belong to him, that it belonged to McCullough, and that he had killed it under authority from McCullough. Robinson testified, as did all the other witnesses, that there was nothing secret about the matter in any way; that appellant did not undertake to conceal the property, but frankly told him how he got it, and why he took it, and from the beginning to the end of the transaction there is nothing to indicate that appellant was trying to secrete the property or that he took it otherwise than as McCullough's animal. In fact, all the evidence shows that the taking was as public as it possibly could be, and that appellant claimed the property to be that of McCullough, with McCullough's authority to kill it. McCullough so testified. This was not even controverted.

In a civil transaction, the evidence would have been sufficient to have justified the jury in returning a verdict for either McCullough or Robinson. The testimony was quite positive on both sides; about as much so as the witnesses could testify. It is nowhere controverted or sought to be controverted that appellant had authority from McCullough to kill his animal. There is no evidence but what appellant believed at the time he was killing the animal that he was killing McCullough's animal. These matters are not controverted, as I understand this record.

Under this state of facts I am of opinion that the evidence does

not support the conviction. There must be a fraudulent taking in order to constitute theft. It has been decided that where the property is taken under claim of right, and if the taker appears to have had any fair color of title or right to take, or if the title under such circumstances be brought into doubt, the court should direct an acquittal. Harris v. State, 17 Texas Crim. App., 177; Evans v. State, 15 Texas Crim. App., 31; Smith v. State, 42 Texas, 444; Boyd v. State, 18 Texas Crim. App., 339.

It has been held also in the decisions of this court that where the taking is open and under claim of right, the question of title should be settled in the civil suit and not in a prosecution for theft. Young v. State, 47 Texas Crim. Rep., 468; Seymour v. State, 12 Texas Crim. App., 391; Owens v. State, 21 Texas Crim. App., 579; Parks v. State, 29 Texas Crim. App., 597; McGown v. State, 27 Texas Crim. App., 183; Brokaw v. State, 85 S. W. Rep., 801. The facts do not show a case of theft because there is utter absence of fraudulent intent.

I might mention cases where the facts are even stronger for the State than shown by this record in which the judgment was reversed and remanded for want of sufficient evidence, if deemed necessary. However, I will cite the cases of Frugar v. State, 63 S. W. Rep., 130; Green v. State, 27 Texas Crim. App., 570; Tarin v. State, 19 Texas Crim. App., 359; Brooks v. State, 8 Texas Crim. App., 341, 27 S. W. Rep., 1079.

Error is assigned on the court's charge, or rather in an omission from the charge in regard to the explanation given by defendant of his possession of the alleged stolen animal and why he slaughtered it. The principal point of attack on the charge in this respect is found in the fact the court failed to instruct the jury that the State, having put in evidence exculpatory statements of the defendant, is bound by the same, unless such statements and explanations are disproved. Under our authorities and in any clear sense of justice this proposition is well taken. The State put in evidence appellant's statements in regard to the taking of the animal. These statements were to the effect that he was authorized by McCullough to kill the animal. McCullough claimed the animal and sustained his claim to it by quite a lot of testimony. He also swore he authorized appellant to slaughter it. The State put in the exculpatory statements and was therefore bound by the statements unless they were disproved. Pharr v. State, 7 Texas Crim. App., 472; Combs v. State, 52 Texas Crim. Rep., 613; Pratt v. State, 53 Texas Crim. Rep., 281; Jones v. State, 29 Texas Crim. App., 20; Pratt v. State, 50 Texas Crim. Rep., 227. This is a sufficient number of cases to sustain the proposition announced. This charge was not given by the court and proper exception was reserved in the motion for new trial for such failure on the part of the court. I therefore, for two reasons, enter my earnest protest against the affirmance: First, that the facts do not show any fraudulent intent, conceding the animal to be Robinson's and not McCullough's; second,

the failure of the court to submit a charge to the jury instructing them that if where the State puts in exculpatory statements of the accused it is necessary for the State, or prosecution to disprove those exculpatory statements; otherwise, the accused is entitled to an acquittal. I am fully persuaded this judgment ought to be reversed on both propositions. I, therefore, dissent.

ON REHEARING.

December 6, 1911.

HARPER, JUDGE.—This case was decided at a former term of this court, but the motion for a rehearing was not heard until recently. In his motion appellant contends that the court was in error in holding that the following grounds in the motion did not properly present complaints to the charge of the court. The three grounds upon which this is based are as follows:

"Because the court erred in the charge in not charging on the effect of the reasonable explanation made by defendant, and put in evidence by the State, and in not charging the jury that the State was bound by such explanation unless disproved. Because the court erred in not instructing a verdict of not guilty, the evidence showing an open taking under a claim of right, and it being improper to settle this dispute in a criminal case. Because the court erred in not charging the jury that if taking was under a claim of right by honest mistake, that subsequent appropriation would not be theft."

Now let us consider them. As to the first in the dissenting opinion herein filed, Judge Davidson says: "The principal point of attack on the charge in this respect is found in the fact the court failed to instruct the jury that the State, having put in evidence exculpatory statements of the defendant, is bound by the same, unless such statements and explanations are disproved. Under our authorities and in any clear sense of justice, this proposition is well taken," and appellant insists in his motion that the State is bound by the explanation offered by appellant. Later on we will present the law as charged by the court, but first we want to go to the evidence. Mr. Volmer testified:

"My name is Wm. Volmer; I know the defendant; I saw him on Saturday, the 20th day of November, 1909; I received information that there were two men, I don't remember whether he said one white man and one black man or not, killing a beef across the H. & T. C. track, near old section 1, on the H. & T. C.; I saddled my horse and rode over there and I found Mr. Roberts and Noonie Lewis, they were working at a killed beef; as I rode up, Mr. Roberts, in a joking manner—he had some beef loaded in the front part of his buggy, two quarters, a blanket underneath, and two quarters loaded above the blanket— 'I am not going to let Mr. Volmer see that meat.' I said, 'You are putting that blanket in a nice mess;' he said, 'I have a wife to wash it,' and I said, 'I did not believe it would be nice to put any more work on

a woman's shoulders than necessary.' He had three quarters loaded in the front part of the buggy; I suggested to Mr. Roberts if I was in his place I would put the head underneath and put the other quarter on top, he said that he thought he would do so, and as he throwed the head in the buggy, he said, 'See here, this animal is marked swallow fork in one ear and underslope in the other'; I said, 'You have killed Mr. Robinson's heifer through mistake, and he answered, 'Well, it was Roberts killing it.' "

Thus it is seen that when appellant's attention was first called to the fact that he had killed Robinson's yearling, he did not explain, and did not make exculpatory statements. Only said, "Well, it was Roberts killing it." When his possession was thus first challenged was the time for him to explain his connection with the killing of another man's yearling. Mr. Volmer got word to Mr. Robinson, and some distance from this point Mr. Robinson approached him when the following conversation is testified to by Mr. Robinson: "I stopped him and I said, 'You have a beef, as I see there, butchered, I understand it is mine;' he says, 'I guess not,' or something to that effect and I told him I knew it was; I saw the head, recognized the flesh marks on the head; the head was rolled up then; very easily recognized; I said, 'Put it out so I can see the head,' and he said, 'Oh, it is branded;' I said, 'I guess not, it is not branded, it is mine;' he then pulled it out, he and I together pulled it out on the grass; I am not sure whether he did or I; anyway, it was pulled out and laid on the ground; there was my mark on it, swallow fork in the right and underslope in the left; he gets down and tries to show me a brand; before that I asked him where he got the yearling and he said he bought it; I asked him for a bill of sale and he said he had none, and I asked him from whom he got it, and he said McCullough, a man living in the Heights; I said, 'What did you pay for it?' He said he was going to get half for going there and killing it on the prairie; he undertook to show me the brand, there was no sign of brand on it." Thus, it is seen when accosted the second time by the owner, he says the animal is branded and that he bought it. He was then asked for a bill of sale and said he had none, and then, asked what he paid for it, he gave another explanation and said, "He was going to get half for going out there and killing it." Is the falsity of this testimony shown by the evidence, and if not, should the State be bound by his failure to give any explanation when first accosted, or bound by the explanation that he bought it, or by the explanation that he was killing it on halves? But the record discloses the falsity of all the explanations.

Mr. McCullough, the man from whom he first said he bought the animal, and then said he was killing it on halves for, says: "I had no contract with defendant further than he was looking after my cattle in a general way; I paid him nothing for his services, it was a neighborly act." After testifying that he, defendant, had reported to him about some of his cattle, he said he asked him: " 'Do you know it is

mine, I know that the brand was very dim?' and he says, 'Yes;' I said, 'Could you see if the brand was on,' and he says, 'I think I could;' I said, 'she was branded very light; that Mr. Tete Roberts had placed his mark on her and notified me of the fact;' he says, 'Your brand hardly shown any, Mac, and I put my mark on her;' Tete Roberts said that to me, he said to me that he did not know what my mark was, and I told him I never marked a cow. I then told the defendant, Roberts, to go and kill her if she is fat, but to be sure she is mine; I said, 'You will know whether it is mine by the flesh marks,' and he said, 'Oh, it is yours,' and I said, 'That will be all right, you kill her and bring her home.' That is as far as any contract went, that is, of course, I expect to pay him for his services." Thus, the testimony of the man whose animal he said he thought it was, testified that he neither sold it to appellant nor had any contract with him to kill it on halves. Certainly then, the State ought not to be bound by such exculpatory statements, when they are both shown by the evidence to be absolutely untrue. Again, in his testimony, appellant says himself: "I did not say that I was going out there to kill this animal on halves and did not so testify on the former trial of this case; did not tell Robinson when he asked me about the yearling that I was killing it on halves. . . . McCullough was going to pay me for killing it; he told me he would pay me for it." Thus, it is seen that appellant, himself, denied making the exculpatory statements that were testified to by Mr. Robinson. Not only was the falsity of them shown by the testimony of McCullough, but appellant even denied the truth of such statements, and said he was not killing the animal on halves; had not bought it, but McCullough promised to pay him for killing it. McCullough says he had not promised to pay him anything; had no contract with him, but that he did expect to pay him. For this reason the authorities cited in appellant's brief and in the dissenting opinion, are not applicable when we take the evidence on the trial, as anyone can see by reading the cases cited, but the court correctly chargd the jury:

"You are instructed that if you believe from the evidence that the cattle described in the indictment was the property of McCullough, you will acquit the defendant, or if you have a reasonable doubt thereof, you will acquit him.

"If you believe from the evidence that the defendant, at the time of taking possession of the cattle described in the indictment, honestly believed that the said cattle was the property of McCullough, you will acquit him whether in fact the one head of cattle belonged to McCullough or not, or if you have a reasonable doubt upon this point, you will acquit defendant.

"The defendant is presumed to be innocent until his guilt is established by the evidence to your satisfaction, beyond a reasonable doubt,

and unless the evidence in this case so satisfies you, then find him not guilty."

Inasmuch as defendant denied making the explanation to Robinson, and if he made it, the falsity of it was amply proven by McCullough and defendant's own testimony, no further or additional charge was necessary or proper.

And now on the sufficiency of the evidence, and the claim that the animal was taken in good faith, McCullough testified he asked if the animal he was talking about was branded; could he (defendant) see the brand? He answered, "I think I could." This was before she was killed. Thus, his attention was called to the fact that McCullough's animal was branded before he killed any animal. The animal killed had no brand on it, nor semblance of a brand on it, if the witnesses, both for the State and defendant are to be believed, and there was nothing on the animal to lead appellant "to think he could see a brand."

Again, appellant's testimony would indicate that Tete Roberts had placed a mark on an animal some four months before appellant killed this animal, consequently were fresh marks. About the marks on the animal killed, Wm. Volmer testified: "The ear marks on this animal were very old; they had been on there ever since it was a small calf; those ear marks had been on that animal about two years and a half." Robinson testified: "The ear marks on the hide were old; had been there a long time; examined the hide carefully; the yearling was about a month or two old when I put my marks on it."

No witness testifies the ear marks on the animal killed were fresh or had been placed thereon recently. Volmer, a cattle man, testifies that no cattle belonging to McCullough run on that range; that he saw the cattle weekly, that he had never seen any of McCullough's cattle running on that range; that he lived in that neighborhood.

McCullough said appellant was looking after his cattle in a general way; it was a neighborly act. If appellant was looking after the cattle, he must have known where they ranged, and no witness says McCullough's cattle ranged in the neighborhood where this animal was killed. If the appellant's witnesses are to have credence placed in them, McCullough did not seek to tell appellant where to find his animal; appellant brought the information, and when cautioned about the brand, said he thought he could see it, but before killing it, did not take the trouble to look for the brand. When it was killed there was no brand. When first his attention was called that he had killed another man's animal, he makes no explanation; when next asked about it, he says he bought it, and then when asked for a bill of sale, he says he was killing it on halves. All this, the testimony shows, is false, appellant saying himself it is not true. While it is true that appellant killed the animal in the day time, yet, when we take what the witnesses for the State say, it was not such an open taking. Mr. Tucker says: "When I first saw Mr. Roberts with this animal, it was about half a mile, maybe a little further, southwest of Eureka; that was where the animal was

killed; that was about three hundred yards from the public road, maybe a little further." . . . He says that in loading the animal, defendant so placed the hide it was underneath the meat in the bottom of the buggy.

Mr. Volmer says that the animal was killed about three miles from Brunner, about three or four hundred feet from the public road. "I left him at the place where he killed the beef. I stayed there until he started home; he started through the prairie. He had about a mile to travel before he would get to the county road. I do not know whether he traveled the public road or went through the woods."

When we consider how the animal was placed in the vehicle, no one passing him could or would discover anything wrong, unless like Mr. Robinson, who had been informed that it was his animal that had been killed, and it had to be unloaded to get at the hide, etc., that the flesh marks could be seen, and demonstrated there was no brand on the animal. After reading and re-reading the case, we are more firmly convinced that the court, in his charge, submitted all the law applicable to the case, and that the evidence justifies and supports the verdict of the jury, especially so when we take into consideration the evidence given and the manner in which it is stated by the witnesses on direct and cross examination.

Motion for rehearing overruled.

*Overruled.*

ON REHEARING.

December 6, 1911.

DAVIDSON, PRESIDING JUDGE, (dissenting).—I have read the opinion of the majority overruling the motion for rehearing. I have reviewed the questions and the authorities referred to by my brethren and am more firmly convinced that the dissenting opinion ought to be the law of the case, and that the evidence is not sufficient to support the conviction. The trial court, nowhere in the charge, instructed the jury in substance or in fact, that before the jury could convict, the State must disprove the exculpatory statements of the defendant. The charge given by the court does not relate to this subject or this question, as made by the facts. The cases cited in the dissenting opinion are directly in point and required of the trial court to instruct the jury that before they could convict, it devolved upon the State to disprove the exculpatory statement admitted in evidence by the court at the instigation of the State. I see no necessity for making this case an exception to the well settled law. The decisions cited announce the proper rule, it has been the recognized rule in all the decisions of this State, and should not now be overturned. They are correct both as a rule of decision and on principle.